### THE INTERSTATE.

### THE ANNIE E. FLANNERY.

(District Court, E. D. New York. March 28, 1922.)

I. **Collision** ⊕➡102—Between two tugs off the pierheads in North River held due to faults of both.

A collision between two tugs in the daytime in North River, off New Jersey pierheads, *held* due to faults on the part of each in navigating on an erroneous assumption as to the course of the other and without due caution.

2. **Collision** ⊕➡90—Narrow channels and bends.

A vessel is not expected to hold her course and speed in a continuous straight line when following a channel course that of necessity curves around bends.

⊕➡For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Admiralty. Suit for collision by the Flannery Towing Line, Inc., owner of the steam tug Annie E. Flannery, against the steam tug Interstate. Decree dividing damages.

Macklin, Brown, Purdy & Van Wyck, of New York City (by W. F. Purdy and Frank P. Treanor, Jr., both of New York City), for libelant.

Park & Mattison, of New York City (by Anthony V. Lynch, Jr., of New York City), for claimant.

CHATFIELD, District Judge. The collision from which this case arises occurred in broad daylight immediately off the Port Liberty coal pier, some distance south of the Communipaw Terminal, in Jersey City. The Flannery, owned by the libelant, was proceeding up the channel inside of Ellis Island, against an ebb tide, and was intending to go into a coal pocket on the north side of the Port Liberty pier, after learning which pocket would be empty. For this purpose the Flannery intended to and did come to rest a few feet outside of the tug John F. Lewis and the Britannia, two tugs lying moored at the end of this pier. The Flannery had proceeded up the starboard side of the channel, which in general is some 300 to 350 feet in width, and, when opposite the end of the Port Liberty pier turned under a starboard helm toward the pier.

The Interstate, which had been moored at Pier 5, some four slips up the river, after backing out into the stream, had headed down the river, on a course which brought her some 150 feet outside of the Burns Bros. coal pier, which is next above the Port Liberty coal pier. The Interstate had, before reaching the Burns Bros. pier, blown a one-whistle signal to the Flannery, which was not answered nor observed by the Flannery, and the evidence shows that the captain of the Flannery gave no heed to the presence of the Interstate until the Interstate reached the vicinity of the Burns Bros. pier.

The general line of the channel and of the pier heads in this vicinity bears to the southwest, and the course of the Interstate was therefore directly toward the slip between the Burns Bros. pier and the Port Liberty pier. In front of this slip a boat, proceeding down the starboard side of the channel, must make a considerable turn under a starboard helm, and until this turn was reached it would be impossible to be sure, from the vessel's course, whether she was bound down the channel or into the slip south of the Burns Bros. pier.

It is shown by the testimony that many tugs proceed each morning into this slip to obtain coal. It is the Interstate's habit to go there for coal, but on the morning in question, according to the testimony, she did not need coal, and therefore did not stop at the Burns Bros. pier, but, upon reaching the point where ordinarily the turn into the slip would be made, she starboarded her helm and went on down the channel, to go to the third pier below, where she could obtain the water.

The master of the Interstate was in the pilot house and his mate at the wheel. Both of them saw the Flannery at all times, and there was no reason at all for any failure on their part to observe the rules of navigation. The captain of the Flannery was handling his boat,

but had no lookout forward, and, as has been stated, did not pay much attention to the Interstate, even when he saw her approaching off the end of the Burns Bros. pier, because of his assumption that she was headed into that slip for coal. In a similar way, the captain and pilot of the Interstate seem to have assumed that the Flannery was headed up the channel toward the Hudson river, and they therefore held their course without regard to the Flannery's movements, and under the right created by their one-whistle signal, until they were so close to the Flannery that the collision could not be avoided.

The captain of the Flannery answered a second one-whistle signal blown by the Interstate, after it had reached a point south of the Burns Bros. pier, by himself blowing a one-whistle signal, and, according to his testimony in court, he understood this signal to mean that the Interstate was intending to cross his bow and go into the slip, but did not, until his ideas were corrected by the movements of the Interstate, contemplate the possibility of the Interstate's proceeding down the channel.

The boats were then so close together, and he was so startled by the movements of the Interstate, that he concluded (as he testifies) that the Interstate had suddenly changed her mind, and under a starboard wheel attempted to swing around, so as to pass him starboard to starboard. The Interstate blew no two-whistle signal for any such maneuver, nor did it give any alarm, and according to the testimony of all the witnesses the vessels were so close together at this time that an alarm would have been of no avail.

It must be found as a fact that the Interstate did not make a turn to swing out of the slip, except in so far as she altered her course off the Burns Bros. pier, to proceed down the channel, instead of into the slip. The vessels came together very close to the two tugs moored off the head of the Port Liberty coal pier; a witness from one of these tugs testifying that he could almost jump upon the Flannery from his boat. The stem of the Interstate struck the Flannery a few feet back of the prow on the starboard side, and did extensive damage, indicating that the Interstate was under considerable way at the time, although, according to the testimony, she had stopped her engines off the Burns Bros. pier until the Flannery answered her one-whistle signal, and had then proceeded under one bell.

It is suggested by the Flannery that the captain of the Interstate may not have directed his pilot to go down the channel, instead of into the slip, until the point where the boat usually stopped for instructions as to which coal pocket should be used; but this does not materially affect the situation.

The captain and pilot of the Interstate testify that the captain of the Flannery was on the starboard side of the channel coming up, until after he had accepted the one-whistle signal of the Interstate, and that he then abruptly starboarded his helm, turned at a right angle, and crossed the channel at such speed as to advance substantially the same distance as the Interstate, which was proceeding under one bell and with the help of the strong ebb tide. This distance is indicated by witnesses at some 100 or 125 feet. The entire testimony and the move-

ments of the Flannery seem to show that she could not have been proceeding with sufficient speed to make any such sharp turn within the time which elapsed, although it is apparent that the Flannery did not come to rest, lying crosswise of the channel, until just before the collision.

The situation presented is one for which no excuse is adequate. The captain of the Flannery had an insufficient lookout. He undoubtedly relied upon his assumption of what the Interstate intended to do, and did not appreciate the full effect of accepting the one-whistle signal from the Interstate, in case his guess as to what the Interstate intended was incorrect. His testimony as to the abrupt turn of the Interstate into collision, while attempting to turn and run out of the slip, cannot be accepted.

[1, 2] A vessel is not expected to hold her course and speed in a continuous straight line, when following a channel course that of necessity curves around bends. But the Interstate should have realized that her direct course down past the Burns Bros. pier would carry her into the slip, and that a turn down the channel would be a change of course on her part. She evidently did not carefully watch the Flannery, so as to observe that the Flannery was turning toward the Port Liberty pier, and, relying upon her own one-whistle signal, started ahead, when so close to the Flannery that the maneuver was dangerous. As the Interstate had stopped her engines at the time of blowing the one-whistle signal, it must be found that the Interstate was negligent in starting up upon what was in effect a changed course, and in running into collision at such a speed that she could not avoid the Flannery, if the Flannery did not lie still or go back on her engines, to give the Interstate room to pass down the channel.

For these reasons, both boats must be held at fault, and the libelant may recover one-half damages.